# Exhibit C

Lisa Barr

1

## Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 3
 4   DEBRA L. EDDY,              )
 5          Plaintiff,           )
                                 ) CIVIL ACTION NO.
 6   vs.                         ) 1:11-cv-00137-IMK
 7   DOLLAR GENERAL CORPORATION, )
     a foreign corporation;      )
 8   DOLGENCORP, LLC, a foreign  )
     limited liability company; and )
 9   SCOTT BIDDLE, an individual;)
     and LISA BARR, an individual; )
10                               )
            Defendants.          )
11   _____)
12
13
14            Deposition of Lisa Barr
15            Tuesday, June 19, 2012
16                 * * *
17   a defendant herein, taken on behalf of the plaintiff
18   in the above-entitled cause of action, pursuant to
19   notice and the Federal Rules of Civil Procedure, by
20   and before Connie M. Nichols, Registered
21   Professional Reporter and Notary Public within and
22   for the State of West Virginia, at the law offices
23   of Steptoe & Johnson, PLLC, 400 White Oaks
24   Boulevard, Bridgeport, West Virginia 26330,
25   commencing at 4:30 p.m.
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   On behalf of the Plaintiff:
 4      EDWARD R. KOHOUT, Esq.
        KRISTIN TAYLOR
 5      Law Offices of Edward R. Kohout, PLLC
        235 High Street, Suite 307
 6      Morgantown, West Virginia 26505
        (304) 777-4086
 7      ed@kohout-law.com
 8
     On behalf of the Defendants:
 9
        ALLISON N. SUFLAS, Esq.
10      Morgan, Lewis & Bockius, LLP
        1701 Market Street
11      Philadelphia, Pennsylvania 19103
        (215) 963-5000
12      asuflas@morganlewis.com
13      WILLIAM J. O'BRIEN, Esq.
        Steptoe & Johnson, PLLC
14      400 White Oaks Boulevard
        Bridgeport, West Virginia 26330
15      (304) 933-8000
        william.obrien@steptoe-johnson.com
16
17   ALSO PRESENT:
18      Debra L. Eddy
19
20               - - -
21
22
23
24
25
```

## Page 3

```
 1                  CONTENTS
 2
 3   Examination of Lisa Barr            Page
 4     By Mr. Kohout                       4
 5
 6              INDEX TO EXHIBITS
 7   Exhibit      Description            Page
 8         (No exhibits were marked.)
 9
10
```

## Page 4

```
 1                   * * *
 2                 LISA BARR
 3   being first duly sworn, was examined and deposed as
 4   follows:
 5                   * * *
 6               E X A M I N A T I O N
 7   BY MR. KOHOUT:
 8   Q.    Would you tell us your name, please.
 9   A.    Lisa Barr.
10   Q.    Where do you live?
11   A.    Daybrook.
12   Q.    What's your address?
13   A.    382 Yank Hollow Road, Fairview,
14   West Virginia.
15   Q.    Yank?
16         How do you spell that?
17   A.    Y-a-n-k.
18   Q.    Like Yankee.
19   A.    Yes.
20   Q.    Do you work at Dollar General?
21   A.    Yes.
22   Q.    Do you work in the Blacksville store?
23   A.    Yes.
24   Q.    And you are the store manager?
25   A.    Yes.
```

Lisa Barr 2

Page 5

1 Q. When did you become the store manager at
2 Blacksville?
3 A. The end of July.
4 Q. Of what year?
5 A. 2011.
6 Q. Prior to that, did you work at the
7 7-Eleven in Blacksville?
8 A. No, I worked for Subway.
9 Q. Subway.
10 Is that in the 7-Eleven building in
11 Blacksville?
12 A. Yes.
13 Q. Do you know a fellow named Dave Spears?
14 A. Yes.
15 Q. Was he your employer?
16 A. No.
17 Q. Was he your manager?
18 A. No.
19 Q. Was he your supervisor?
20 A. No.
21 Q. What was your relationship with Dave
22 Spears?
23 A. He was a coworker.
24 Q. A coworker, okay.
25 At the Subway?

Page 6

1 A. No.
2 Q. At the 7-Eleven?
3 A. He worked 7-Eleven; I worked Subway.
4 Q. Okay.
5 And then how long have you been with
6 Dollar General?
7 A. Two years.
8 Q. Starting when?
9 A. May 1, 2010.
10 Q. And prior to that, you worked at the
11 Subway in Blacksville?
12 A. Yes.
13 Q. What did you do at Subway?
14 A. I was a manager.
15 Q. How long were you at Subway?
16 A. They took over the store.
17 Four years.
18 Q. And why did you leave Subway?
19 A. I was working a lot of hours.
20 Q. Were you asked to leave Subway?
21 A. No.
22 Q. Did you have any problems at Subway?
23 A. No.
24 Q. Prior to Subway, what did you do?
25 A. I worked for the Blacksville D-Mart.

Page 7

1 Q. That's a convenience store?
2 A. Yes.
3 Q. Who owns that?
4 A. It's no longer there, the 7-Eleven took
5 over the D-Mart.
6 Q. Was that owned by the Hixenbaughs?
7 A. No, it was not.
8 Q. Was that by the bridge there?
9 A. It was across from the high school.
10 Q. Okay.
11 And what did you do at the D-Mart?
12 A. I was a clerk, and then I was a manager.
13 Q. How long were you there?
14 A. From '93 until -- I worked in that store
15 17 years, total.
16 Q. And why did you leave the D-Mart?
17 A. Subway took over D-mart.
18 Q. And what's your date of birth?
19 A. 4/15/65.
20 Q. What's your age today?
21 A. 47.
22 Q. Do you know Debra Eddy?
23 A. Yes.
24 Q. She's sitting here with us today.
25 Do you see her in the room?

Page 8

1 A. Yes.
2 Q. Have you ever had your deposition taken
3 before?
4 A. No.
5 Q. Have you ever been involved in a court
6 case before?
7 A. No.
8 Q. Do you have any criminal record?
9 A. No.
10 Q. Have you ever been arrested for
11 anything?
12 A. No.
13 Q. When you came to work for Dollar General
14 5/1 of 2010, did you work for Debra Eddy at the
15 Dollar General store?
16 A. Yes.
17 Q. Did she hire you?
18 A. Yes.
19 Q. And she testified earlier that she knew
20 you from working at Subway, and had more or less
21 recruited you to come apply at Dollar General; is
22 that right?
23 A. No.
24 Q. How did you come to apply to work at
25 Dollar General?

Page 9

1  A.     I walked in and asked her if she was
2  hiring anyone.
3  Q.     Okay.
4         You didn't know her prior to that?
5  A.     Yes, I did.
6  Q.     How did you and Debra Eddy get along
7  during the time from when you started at Dollar
8  General on May 1 of 2010 until when she left on
9  May 27, 2011?  How did you two get along?
10 A.     Okay.
11 Q.     Did you know Paula Cummins?
12 A.     Yes.
13 Q.     Did you get along with her?
14 A.     Yeah.
15 Q.     Did Debra Eddy and Paula Cummins get
16 along?
17 A.     Sometimes.  Not most of the time, no.
18 Q.     Ms. Eddy testified in her deposition
19 that there were times when she could not get
20 Ms. Cummins to work and had a difficult time getting
21 her to do things.  Is that what you observed when
22 you were there?
23 A.     Yes.
24 Q.     Were you friends with Paula Cummins?
25        MS. SUFLAS:  Objection to form.

Page 10

1         But you can go ahead and answer.
2  A.     We were coworkers.  We weren't good
3  friends, no.
4  BY MR. KOHOUT:
5  Q.     And do you know Alisha Tennant?
6  A.     Yes.
7  Q.     Did you work with her?
8  A.     Yes.
9  Q.     Is she still at the store?
10 A.     No.
11 Q.     Did she leave?
12 A.     Yes.
13 Q.     Do you know why she left?
14 A.     Yes.
15 Q.     What was the reason?
16 A.     Because I switched her shifts around,
17 and she didn't want to work the shift.
18 Q.     And Sarah Cross, did you know her?
19 A.     Yes.
20 Q.     And what was her job there?
21 A.     She was a cashier.
22 Q.     And how about Judy Jones, did you work
23 with her?
24 A.     Yes.
25 Q.     What was her job there?

Page 11

1  A.     She was a cashier.
2  Q.     During the time that you worked with
3  Debra Eddy, is it not true that Debra Eddy was the
4  oldest employee in the store?
5  A.     I don't know.
6  Q.     Was Judy younger than Debra Eddy?
7  A.     Yes.
8  Q.     We've established that Debra Eddy is
9  50 years old and she's --
10        MS. SUFLAS:  Objection to form.
11 BY MR. KOHOUT:
12 Q.     -- and she was 49 last year, when she
13 was fired.  And you're younger than that, right?
14 A.     Yes.
15 Q.     Alisha Tennant, how old was she,
16 roughly?  Was she in her 20s?  30s?
17 A.     I do not know.
18 Q.     Was she a young girl?
19        MS. SUFLAS:  Objection to form.
20 A.     She was middle -- I don't know.
21 BY MR. KOHOUT:
22 Q.     How about Paula, how old was Paula,
23 roughly?
24 A.     I don't know.
25 Q.     All right.

Page 12

1         Was there friction between Debra Eddy
2  and the girls I just mentioned, at the Blacksville
3  store?
4         MS. SUFLAS:  Objection to form.
5         But you can go ahead and answer.
6  A.     That, I don't know.
7  BY MR. KOHOUT:
8  Q.     You don't know about any problems that
9  Debra Eddy might had have with the employees when
10 she was manager?
11 A.     I knew of some problems, yes.  But those
12 two, I do not know.
13 Q.     What kind of problems?
14 A.     Well, some people didn't want to work.
15 Q.     What else?
16 A.     That's pretty much it, they just didn't
17 want to work.
18 Q.     Did Paula have a habit of taking Cokes
19 off the shelf and drinking Cokes and not paying for
20 them?
21 A.     That, I don't know about.
22 Q.     Or food items or anything like that, and
23 not paying for them?
24 A.     Not that I know of.
25 Q.     Were you aware of Debra Eddy stealing

Page 13

1  anything from the store prior to May 18, 2011?
2  A.    No.
3  Q.    I'm sorry?
4  A.    No.
5  Q.    What was your impression of Debra Eddy
6  as a manager? Did you think she was a good manager
7  or a bad manager?
8        MS. SUFLAS: Objection to form.
9        But you can go ahead and answer.
10 A.    I thought she was good.
11 BY MR. KOHOUT:
12 Q.    Were there times when the staffing was
13 short-handed at the Blacksville store, during the
14 time you were there?
15 A.    Yes.
16 Q.    Did you ever hear Debra Eddy complain
17 about being short-handed?
18 A.    Yes.
19 Q.    Did you ever hear Debra Eddy complain
20 about having to work long overtime hours?
21 A.    Yes.
22 Q.    Do you recall Debra Eddy ever discussing
23 short-handedness of the store, or her having to work
24 long overtime hours with Scott Biddle?
25       MS. SUFLAS: Objection to form.

Page 14

1        But you can go ahead and answer.
2  A.    I don't really recall.
3  BY MR. KOHOUT:
4  Q.    Do you recall a meeting that Scott
5  Biddle had with all of the employees at the
6  Blacksville store, about friction between the
7  employees and Debra Eddy?
8  A.    Yes.
9  Q.    What was that all about?
10 A.    Just what you said, there was a lot of
11 problems in the store, a lot of complaints.
12 Q.    Complaints by whom and against whom and
13 about what?
14 A.    A lot of complaints about things not
15 getting done.
16 Q.    Who wasn't getting things done?
17 A.    Employees.
18 Q.    Was Debra Eddy complaining about the
19 employees not getting things done?
20 A.    Yes.
21 Q.    Was she having difficulty managing her
22 employees?
23       MS. SUFLAS: Objection to form.
24       But you can go ahead and answer.
25

Page 15

1  BY MR. KOHOUT:
2  Q.    From what you observed.
3  A.    Yes.
4  Q.    Was that what this meeting was all
5  about, with Scott Biddle?
6  A.    Part of it, yes.
7  Q.    And what do you recall was said at that
8  meeting?
9  A.    I don't know. It's been a while.
10 Q.    Did you ever have any discussions with
11 Scott Biddle about you becoming a manager?
12 A.    No.
13 Q.    Have you seen a copy of the complaint?
14 A.    Yes.
15 Q.    Have you read it?
16 A.    Yes.
17 Q.    Do you know why Debra Eddy is filing
18 this lawsuit? In other words, what her allegations
19 are?
20       MS. SUFLAS: Objection to form.
21       But you can go ahead and answer.
22 A.    Yes.
23 BY MR. KOHOUT:
24 Q.    She alleges in her complaint that Scott
25 wanted to make you a manager, and made the comment

Page 16

1  that he was going to promote you as soon as an
2  opening came open. Were you aware of that comment?
3  A.    Not that comment, no. What he actually
4  said was: One day Lisa will make a good manager.
5  Q.    Who did he say that to?
6  A.    The group of employees.
7  Q.    Was this at that meeting?
8  A.    Yes.
9  Q.    But you're saying that he had no
10 conversations with you other than that?
11 A.    No.
12 Q.    How would you describe your relationship
13 with Scott Biddle?
14 A.    He's my boss.
15 Q.    Did you have any kind of social
16 relationship with him, outside the store?
17 A.    No.
18 Q.    Were you aware of any friction that
19 existed between Debra Eddy and Scott Biddle during
20 the time that you were there before she left?
21 A.    No.
22 Q.    Were you aware of any accusations by any
23 employee against Debra Eddy for violating company
24 policy, stealing things, doing anything wrong?
25       MS. SUFLAS: Objection to form.

Page 17

1 But you can go ahead and answer.
2 A. Yes.
3 BY MR. KOHOUT:
4 Q. Like what?
5 A. Call-offs.
6 Q. Call-offs?
7 A. Yes.
8 Q. What do you mean by that?
9 A. Calling off, not giving enough notice.
10 Q. Did you know she had been injured at
11 work?
12 MS. SUFLAS: Objection to form.
13 But you can go ahead and answer.
14 A. No.
15 BY MR. KOHOUT:
16 Q. Did you think, yourself, that she was
17 calling off just to get out of work?
18 A. Sometimes, yes.
19 Q. Was she a hard worker?
20 A. Yes.
21 Q. Well, why would she call off, then, just
22 to get out of work if she was a hard worker?
23 MS. SUFLAS: Objection to form.
24 But you can go ahead and answer.
25 A. She would be in Pittsburgh with her

Page 18

1 boyfriend and did not want to come home.
2 BY MR. KOHOUT:
3 Q. How often did this happen?
4 A. About once a month.
5 Q. Was she ever written up for that, as far
6 as you know?
7 A. No.
8 Q. Do you know why?
9 A. No, I do not.
10 Q. Did Scott Biddle know about this?
11 A. Yes.
12 Q. Did you tell him, or how did he find
13 out?
14 A. No, I didn't tell him.
15 Q. Who told him?
16 A. Paula.
17 Q. Do you know whether Scott Biddle talked
18 to Debra Eddy about these absences?
19 A. No, I do not.
20 Q. Do you know a fellow, a customer named
21 Bill Vidas?
22 A. I'm trying to think. I know a lot of
23 customers.
24 Yes.
25 Q. Did you ever make a comment to Bill

Page 19

1 Vidas that you were going to have Debra Eddy's job
2 as manager no matter what it took?
3 A. No, I did not.
4 Q. Did you see that in the complaint?
5 A. Yes, I did.
6 Q. You disagree with that?
7 A. Yes, I do.
8 Q. Let's talk about the night of May 18,
9 2011. Were you working at the store that night?
10 A. Yes.
11 Q. Did Debra Eddy come in?
12 A. Yes.
13 Q. Tell us what happened that night, in
14 your own words, from what you saw and heard.
15 A. She came in, she said her back was
16 bothering her. She's got dog treats and heat
17 patches. Laid them on the counter. She went to the
18 bathroom. I told the cashier as soon as she got
19 finished in the bathroom, I would close the door and
20 pull her drawer. She said, "I have a credit card."
21 I looked at the other girl, I said, "Did
22 she say she had a credit card?"
23 She goes, "Yes, she did."
24 She came out, seen the sign saying "cash
25 only." She goes, "Well, I'm going to take these,

Page 20

1 and I'll come back tomorrow and pay for them."
2 And I went, "Oh."
3 And she left.
4 Q. Did she tell you that? Did she say that
5 to you or to the other girl?
6 A. To both of us, we were both standing
7 there.
8 Q. Did you say "okay" or "oh"?
9 A. I went "oh."
10 Q. Who was the other girl?
11 A. Sarah Cross.
12 Q. Did you think there was anything unusual
13 about that?
14 A. A little bit.
15 Q. What were -- the dog treats and the heat
16 packs, right?
17 A. Yes.
18 Q. One pack of dog treats and one pack
19 of --
20 A. No, there was like five things, there
21 was a couple of dog treats and a couple of heat
22 patches.
23 Q. What was the retail value of these
24 items?
25 MS. SUFLAS: Objection to form.

Page 21

1  But you can go ahead and answer.
2  A.  I'm not, I'm really not sure.
3  BY MR. KOHOUT:
4  Q.  Are you aware of any employees at the
5  store ever taking things out of the store and paying
6  for them later?
7  A.  No, not taking them out of the store,
8  no.
9  Q.  Are you aware of any employees consuming
10 merchandise on the premises without paying for them
11 at the time but paying for them later?
12 A.  Yes.
13 Q.  Who did that?
14 A.  A lot of us did that.
15 Q.  Like what kind of items?
16 A.  It was usually a soda or a bag of chips,
17 early in the morning, before the registers opened.
18 Q.  Did Paula do this?
19 A.  Yes.
20 Q.  Did you ever know Debra Eddy to pay for
21 sodas and chips that Paula had done, had taken?
22 A.  I've known her to pay for sodas and
23 chips that were on the break-room table. Who took
24 them? I have no idea.
25 Q.  Okay.

Page 22

1  But some employee would take chips off
2  the shelf, go in the break room, not pay for them,
3  and then Debra Eddy would come along and put money
4  in the register and pay for them.
5  A.  Yes.
6  Q.  And how often did she do this?
7  A.  Probably about every two or three
8  months.
9  Q.  Did Scott Biddle know about this?
10 A.  No.
11 Q.  Was this a secret?
12     MS. SUFLAS: Objection to form.
13 But you can go ahead and answer.
14 A.  Not that I know of.
15 BY MR. KOHOUT:
16 Q.  Do you think that was any kind of a
17 violation of company policy?
18 A.  Yes.
19 Q.  And you say "a lot of us did it."
20 A.  Yes.
21 Q.  Did you do it?
22 A.  Yes, I've even took a soda and drank it.
23 Q.  And did Scott Biddle ever question you
24 or Alisha Tennant or Paula Cummins or anybody else
25 that you worked with at the Blacksville store about

Page 23

1  taking items and not paying for them?
2  A.  Yes.
3  Q.  When did he talk to you about this?
4  A.  Well, I had walked in the break room one
5  time and there was a soda sitting there, and he
6  goes, "Do you know who these belong to?"
7      Because they didn't have receipts on
8  them.
9  Q.  So he knew that employees, generally,
10 were taking sodas back to the break room, and bags
11 of chips, and not paying for them.
12     MS. SUFLAS: Objection to form.
13 But you can go ahead and answer.
14 A.  Yes. But also our manager had told us
15 it was okay when we were working freight to wait
16 until the register was open.
17 BY MR. KOHOUT:
18 Q.  And your manager at that time was who?
19 A.  Debra Eddy.
20 Q.  Okay.
21     Well, was this a practice that was begun
22 by Debra Eddy; do you think?
23 A.  I don't think so.
24 Q.  It was just something that the employees
25 did, right? On their own.

Page 24

1  A.  No, I don't think it was on their own
2  either. Because when I first started working there,
3  she said, "You can get a soda and pay for it when
4  the register is open."
5  Q.  When would the register not be open?
6  A.  When we came in to work freight, from
7  6:00 a.m. until 8:00 a.m.
8  Q.  Oh, okay. I see. All right.
9      Are you aware of any employees at the
10 Blacksville store taking items out of the store and
11 not paying for them?
12 A.  No.
13 Q.  Are you aware of any accusation that was
14 ever made against Debra Eddy about stealing
15 detergent out of the back room?
16 A.  No.
17 Q.  But you're saying that Scott Biddle did
18 know that the employees were taking Cokes and bags
19 of chips into the break room, and consuming those
20 items during working freight, and things like that,
21 and not paying for them until later?
22 A.  I think so. I mean it happens in every
23 store.
24 Q.  Okay. All right.
25     And how much later would the items then

Page 25

1  be paid for?
2  A.     They were supposed to be paid for when
3  the register opened.
4  Q.     But, again, how much later, when you saw
5  Cokes and bags of chips on the break-room table,
6  typically how long would it take for those items to
7  be paid for?
8           MS. SUFLAS: Objection to form.
9           But you can go ahead and answer.
10 A.     I don't know.
11 BY MR. KOHOUT:
12 Q.     Was it days?
13 A.     Sometimes.
14 Q.     Days later?
15 A.     Sometimes, yes.
16 Q.     Did you ever see Debra Eddy take any
17 merchandise, herself, back into the break room and
18 not pay for it?
19 A.     Yes.
20 Q.     Like what?
21 A.     She would take Coke or a bag or chips
22 or -- yes.
23 Q.     And pay for it later?
24 A.     Yes.
25 Q.     You saw her pay for things?

Page 26

1  A.     Yes.
2  Q.     And how soon later would she pay for
3  them?
4  A.     Either that day or the next day.
5  Q.     So we talked about May 18. The next day
6  or the next couple of days, did Debra Eddy come by
7  the store with a doctor's slip to show you?
8  A.     Yes.
9  Q.     Did she say she was going to be off work
10 for a few days?
11 A.     Yes.
12 Q.     And did you have a reaction to that?
13 A.     Yes, I did.
14 Q.     What did you say?
15 A.     I said I could not stay, that I had
16 personal things to take care of.
17 Q.     Did you have to go to the courthouse?
18 A.     Yes, I did, I had to get tags for my
19 car.
20 Q.     Was there anybody else that could have
21 filled in for Debra Eddy while she was off sick?
22 A.     Paula.
23 Q.     And where was Paula at this time?
24 A.     I'm not sure. She wasn't at the store.
25 Q.     Was she supposed to be?

Page 27

1  A.     No.
2  Q.     Was she off?
3  A.     Yes.
4  Q.     Had you ever been written up for any
5  policy violations?
6  A.     I was short, like my first week there.
7  I was short, I don't know, like $3.
8  Q.     What happened about that? Were you
9  talked to by somebody about it?
10 A.     Yes.
11 Q.     Who talked to you about it?
12 A.     Debbie.
13 Q.     What did she say?
14 A.     She just informed me that I was short
15 and that I needed to pay attention to my cash.
16        It was like the first or second day I
17 was there, yes.
18 Q.     Did you ever hear Scott Biddle talk --
19 did Scott Biddle ever talk to you about any policy
20 violations?
21 A.     No.
22 Q.     Were you aware of Scott Biddle talking
23 to any of the employees about policy violations?
24 A.     No.
25 Q.     Are you aware of any employees at the

Page 28

1  Blacksville store being fired for policy violations?
2  A.     Yes.
3  Q.     Who?
4  A.     Judy Jones.
5  Q.     Why was she fired?
6  A.     Her drawer was short.
7  Q.     How many times?
8  A.     Three or four.
9  Q.     How much was it short?
10 A.     The last time was $20 and some change.
11 Q.     Was she fired right away?
12 A.     No.
13 Q.     Did Scott Biddle know about this?
14 A.     I believe so.
15 Q.     Did he fire her?
16 A.     No, Deb did.
17 Q.     Are you aware of any other employees at
18 the Blacksville store being terminated, during the
19 time that you had been there, and what were they
20 terminated for?
21 A.     No.
22 Q.     Other than Judy Jones.
23 A.     No.
24 Q.     Just Judy Jones?
25 A.     Yeah, as far as I knew, yes.

Page 29

1  Q.     So the next day or so, Debra Eddy came
2  by with a doctor's note. And what did you do with
3  the doctor's note?
4  A.     I laid it on the desk.
5  Q.     In the office?
6  A.     Yes.
7  Q.     Did you have any conversation with Scott
8  Biddle that day, when Debbie came by with the
9  doctor's note?
10 A.     Yes, I did call him and tell him that
11 Debra would be off for the next week or so, that she
12 said she had hurt her back.
13 Q.     Do you remember what day this was? Was
14 it like May 19? Or do you remember what day it was?
15 A.     She came by the next day, it was May 19.
16 Q.     And what did he say?
17 A.     He just said okay, he would get ahold of
18 her.
19 Q.     Did you ever hear any rumors during that
20 week or the days leading up to May 27, that Debbie
21 was going to be fired?
22 A.     No.
23 Q.     On May 27, Scott was in the store all
24 day, was he not?
25 A.     I was off that day.

Page 30

1  Q.     Did you come in the store that day,
2  May 27?
3  A.     Yes.
4  Q.     Did you have a conversation with Scott?
5  A.     I just said "hi" to him.
6  Q.     Did he call you back into the office?
7  A.     He asked me what I was doing, and I told
8  him I was going to my son's graduation.
9  Q.     Did you go back in the office and talk
10 to him?
11 A.     I stood inside the break room, and he
12 was in the office.
13 Q.     Okay.
14        Why did you come to the store that day?
15 A.     To buy pantyhose.
16 Q.     Okay.
17        And why did you go back in the break
18 room?
19 A.     I seen him standing out in the store,
20 and I said "hi" to him. And he just asked me what I
21 was doing.
22 Q.     Did you go back in the office with Scott
23 Biddle?
24 A.     No, I did not.
25 Q.     Did you have any discussion with Scott

Page 31

1  Biddle on May 27 about Debra Eddy?
2  A.     Yes.
3  Q.     When did that occur? Where did it
4  occur? And what did you talk about?
5  A.     I had got home, the phone rang, Scott
6  called me and asked me if I knew Paula's phone
7  number and the number to the safe.
8  Q.     Okay.
9         That's all he said?
10 A.     Yes.
11 Q.     Did you talk about Debra Eddy to Scott
12 Biddle on May 27?
13 A.     I just asked him what was going on, and
14 he said Deb no longer worked there. That's all that
15 was said.
16 Q.     You didn't ask why?
17 A.     No.
18 Q.     So you're saying that -- because Debra
19 Eddy testified that that day she was in the store,
20 working; you came in -- as a customer; Scott came to
21 you and said, "Come back in the office;" and he
22 closed the door.
23        Now, are you saying that didn't happen?
24 A.     No, that did not happen.
25 Q.     Did you have any discussion with Lee

Page 32

1  Holcomb about Debra Eddy?
2  A.     Yes.
3  Q.     What was that all about?
4  A.     He came in; said he wanted to see the
5  video; I opened -- let him in the office; and then
6  he came to me and started questioning me about the
7  things she had taken.
8  Q.     So you knew -- oh, by the way, back up.
9         When did this happen? When did Lee
10 Holcomb come in and look at the video? Is that the
11 27th? The 26th?
12 A.     No. The 27th was a Friday. It was
13 Monday or Tuesday of that week.
14 Q.     Okay.
15        So that would have been like the 23rd of
16 May, maybe Monday?
17 A.     Yes.
18 Q.     So did you figure something was up,
19 then, when Lee Holcomb was in the store, looking at
20 the video?
21 A.     Yeah.
22 Q.     What did you think was going on?
23 A.     I really wasn't sure.
24 Q.     Debra Eddy has testified and stated in
25 the complaint that she told you she was going to

Page 33

1  take these items and pay for them later, and you
2  said okay. Is that not true?
3          MS. SUFLAS: Objection to form.
4          But you can go ahead and answer.
5  A.     She told me she would pay for them the
6  next day.
7  BY MR. KOHOUT:
8  Q.     Okay.
9          And you said?
10 A.     I went, "Oh."
11 Q.     What does "oh" mean?
12 A.     Like "oh," it was just a shock that she
13 did something like that.
14 Q.     I mean you didn't try to stop her from
15 leaving the store, did you?
16 A.     She was my boss.
17 Q.     Right.
18         Did you call Scott Biddle immediately
19 and say, "Hey, Debra just took items out of the
20 store"?
21 A.     No.
22 Q.     Because you thought it was okay, right?
23         MS. SUFLAS: Objection to form.
24         You can go ahead and answer.
25 A.     No.

Page 34

1  BY MR. KOHOUT:
2  Q.     You didn't think anything of it at the
3  time, did you?
4  A.     Yes.
5  Q.     Well, what did you do about it? You
6  were the assistant manager on duty that night.
7  A.     I was the lead clerk.
8  Q.     Well, okay, as the lead clerk, what did
9  you do?
10 A.     I took her word that she would be in the
11 next day. When she still had not came in on
12 Saturday, I just went to Paula and asked her if Deb
13 had came in and paid for the stuff she had taken.
14 Q.     Okay. All right.
15         And then do you know what Paula did?
16 A.     No, I do not.
17 Q.     So you talked to Lee Holcomb; he saw the
18 video; he questioned you about it.
19         What did you tell Lee Holcomb about
20 this?
21 A.     The same thing I'm telling you: that
22 she came in that night; picked up the things; only
23 had a credit card; and left and said she'd pay for
24 them later.
25 Q.     When she was taking these items out of

Page 35

1  the store, did you think to call the police?
2  A.     No.
3  Q.     Why not?
4  A.     For one, she was my boss.
5  Q.     Did you think she was stealing these
6  things?
7  A.     No. I didn't think, I didn't think she
8  should be taking them out. They weren't that
9  important.
10 Q.     But you're saying, you're testifying
11 that you did not approve this, in other words. You
12 didn't say, "Oh, okay, go ahead."
13 A.     No, I did not.
14 Q.     Okay, that's fine.
15         And other than this incident that we've
16 just talked about, the May 18 through the 27th, can
17 you think of any reason why Debra Eddy would have
18 been fired?
19         MS. SUFLAS: Objection to form.
20         But you can go ahead and answer.
21 A.     No.
22 BY MR. KOHOUT:
23 Q.     How did you come to replace Debra Eddy
24 as the manager? Did somebody come to you and offer
25 you the job?

Page 36

1  A.     Scott told me and Paula both that there
2  was an opening, we could go on-line and take a test,
3  and that was it.
4  Q.     Did you go on-line and take a test?
5  A.     Yeah, about a month later.
6  Q.     Did you pass it?
7  A.     Yes.
8  Q.     Did you pass it the first time?
9  A.     Yes.
10 Q.     Did Paula take the test?
11 A.     No.
12 Q.     Did she not even try to get the job?
13 A.     No. She had personal issues she is
14 dealing with.
15 Q.     What were they; did you know?
16 A.     Yes.
17 Q.     What were they?
18 A.     Her husband has cancer.
19 Q.     I see.
20         Is she still working there?
21 A.     Yes.
22 Q.     What is her role now, is she the
23 assistant manager?
24 A.     Yes.
25 Q.     How do you two get along?

Lisa Barr                                                                                              10

**Page 37**

1  A.   Okay, I guess.
2  Q.   Does she work for you?
3  A.   Yes.
4  Q.   Does she do a good job?
5  A.   Most of the time.
6  Q.   Do you think you get along better with
7  Paula than Debbie did?
8       MS. SUFLAS: Objection to form.
9       But you can go ahead and answer.
10 BY MR. KOHOUT:
11 Q.   From what you could observe?
12 A.   I don't know.
13 Q.   Now, these were all female employees at
14 the Blacksville store, right?
15 A.   No.
16 Q.   Were there any male employees?
17 A.   Yes.
18 Q.   Who?
19 A.   Andrew worked there, Jonathan worked
20 there, Nelson worked there.
21 Q.   What period of time did they work there?
22 A.   I'm not sure the exact period of time.
23 Q.   What was Jonathan's last name?
24      MS. EDDY: Efaw.
25

**Page 38**

1  BY MR. KOHOUT:
2  Q.   And Andrew, what was his last name; if
3  you know?
4       MS. SUFLAS: If you don't know,
5  it's okay to say --
6  A.   I don't know.
7  BY MR. KOHOUT:
8  Q.   Are they still there?
9  A.   No.
10 Q.   Any other male employees you can think
11 of?
12 A.   That was there when she was there?
13 Q.   Yeah.
14 A.   No.
15 Q.   Who is Andrew Lapel? Is that the Andrew
16 that worked there?
17 A.   Yes.
18 Q.   Do you recall any discussions with him
19 about any of this?
20 A.   No.
21 Q.   And, again, just to clarify, do you
22 recall any conversations that you had with Scott
23 Biddle about this night of May 18 involving Debra
24 Eddy?
25 A.   Just the night that he fired her, he

**Page 39**

1  called me and said that she was no longer there.
2       MR. KOHOUT: I don't think I
3  have anything else.
4       MS. SUFLAS: I don't have
5  anything either. You survived.
6       (Deposition was concluded at 5:05 p.m.)
7       (Signature was not waived by the
8  witness.)

**Page 40**

THE STATE OF          :
WEST VIRGINIA         : SS. CERTIFICATE
COUNTY OF OHIO        :

I, CONNIE M. NICHOLS, Registered Professional Reporter, do hereby certify that the testimony given by the within-named witness, LISA BARR, was by me reduced to stenotype in the presence of the witness; afterwards reduced to Computer Aided Transcription under my direction and control; that the foregoing is a true and correct transcription of the testimony given by said witness.

I do further certify that this testimony was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

IN WITNESS THEREOF, I have hereunto set my hand in Wheeling, West Virginia, on the _____ day of _____, 2012.


                              _____
                              CONNIE M. NICHOLS
                              Registered Professional Reporter

Lisa Barr

11

Page 41

```
 1   THE STATE OF        :
     WEST VIRGINIA       :
 2                       : SS: CERTIFICATE
     COUNTY OF OHIO      :
 3
 4
            I, CONNIE M. NICHOLS, Notary Public within
 5   and for the State of West Virginia, duly
     commissioned and qualified, do hereby certify that
 6   the within-named witness, LISA BARR, was by me duly
     sworn to testify to the truth, the whole truth and
 7   nothing but the truth in the cause aforesaid.
 8
 9
            I do further certify that I am not a
10   relative, counsel or attorney of either party, or
     otherwise interested in the event of this action.
11
12
13          IN WITNESS THEREOF, I have hereunto set my
     hand and affixed my seal of office at Wheeling,
14   West Virginia, on the ___ day of
     _____, 2012.
15
16
17
18
            CONNIE M. NICHOLS, Notary Public
19          within and for the State of
            West Virginia
20
21
     My Commission expires:
22   October 16, 2016
23
24
25
```

Freedom Court Reporting, Inc                877-373-3660